The next case is Johnson v. Fee. We'll hear first from Mr. Wehmeyer. I believe you have six minutes for rebuttal, but please keep track of your own time. Yes, ma'am. Thank you, Your Honor. I'm Jason Wehmeyer here on behalf of Deputies Andrew Fee and Larry Hughes of the Forsyth County Sheriff's Office here in Georgia. This is an inmate deliberate indifference claim for delay in medical care, and this is our appeal from denial of qualified immunity. It was a summary judgment motion, and the district court denied qualified immunity to these two officers. I wanted to start by giving a brief timeline, because that's going to make it clear that these officers really had no material involvement in this medical, Mr. Johnson's medical care. There's no legally recognizable harm from delay in medical care. In 2009, Mr. Johnson had a hernia. We're not sure when it arose, but he was in the Georgia prison system. Fast forward to June of 2013, he was still a Department of Corrections inmate, and he was at the Forsyth County Jail visiting there for a court appearance. There he was scheduled for a hernia consult to evaluate whether he was appropriate for surgery. That was June 3rd of 2013, and apparently the doctor decided that he should have surgery, so surgery was scheduled for over a month later, July 11th, 2013. Fast forward to July 11th, there was a production request from Augusta State Medical Prison, the Georgia Department of Corrections. The Forsyth County Sheriff's Office honored that request and sent Mr. Johnson to Augusta State Medical Prison. Mr. Weimar, what evidence do we have that that was a request from that entity? The way I read the document, it's really not clear that it was a request. It seems like the plainer reading would be that it's a response to a request. This is authorization to transport. I'm reading from it. This is document 102-1. Please coordinate transport and security. Please transport today if possible. Tanya, please ensure the inmate is transported. I understand the question about whether it's a response to something or whether it's an actual request. I understand from my folks that it was a request, and that's what they're responding to. The bigger point in this particular appeal is that Fee and Hughes were not in the loop here. They had absolutely nothing to do with this request, this response, whatever it is. They haven't even come into the timeline yet is the overall point. Let me ask the question this way if I can, counsel. Yes, sir. What evidence, if any, is there that Fee and Hughes were aware of the fact that Mr. Johnson had been scheduled for laparoscopic surgery on July the 12th? Zero, Your Honor. Zero. The only time that they come into this and have any kind of potential inkling that there's a medical issue in play is on July 25th of 2013 when they respond to his grievance. His grievance is July 24th of 2013, roughly two weeks after the hernia surgery has been canceled. And then the 25th, the response from Fee, which is reviewed and then signed off on by Hughes, is that Fee will need to see a court order to proceed any further. The grievance is about why did they send me to the Department of Corrections? The court order says I shouldn't have been sent to the Department of Corrections. And they canceled my surgery at the hospital, et cetera. I want to know the people who did that. That's what the grievance is about. It doesn't say what the surgery is about. It doesn't say what the medical issue is about. And that's really not what the grievance is about. Well, the only piece of evidence that I can see in the record and the one that was cited by counsel is in the inmate request grievance form that was noted as Exhibit 16. And in it, there is a response from one of your clients who writes in response to the grievance filed by Mr. Johnson. This decision was made, referring to the transfer, by Augusta State Medical Prison. We sent you there for the procedure you requested to be done. They argue that that suggested that at least C, who was the signatory and who wrote this stuff in, knew that he was going for a procedure. Although it's not clear that when they referenced, when C references, we sent you there for the procedure you requested to be done, that he was referring to the surgery as opposed to a medical evaluation in a medical facility of the DOC. Is there any other evidence bearing upon the knowledge of either C or Hughes that he was suffering from, let's assume for the purposes of my question, a serious medical condition? So there's no evidence that favors the plaintiff. There is evidence from C and Hughes. They both testified they didn't know anything about this inmate's medical condition. They were not involved in dealing with his medical condition. They were not even in the chain of command to deal with his medical condition. So there is evidence, and it's evidence that favors us that should have been, you know, that warrants summary judgment. Let me ask you just one other question if I can for a moment. Referring to Hughes, he at least signed off on the transfer order as the supervisor. Is there any evidence that Lee played any role in the transfer? C did not play any role in the transfer whatsoever. Lieutenant C, is there any evidence that Lieutenant C played any role in the transfer? No, there's not. And I'll say that Hughes, two minutes remaining. I'm sorry, is there any evidence that C supervised Hughes in Hughes' duties as a supervisor, having responsibility for signing off on these transfer orders? I can't specifically answer that question because I don't know the day-to-day workings and whether either was in the other chain of command. I'm just asking a simple question. Is there any record evidence in front of me suggesting that C had any supervisory power over Hughes' decision making? No, Your Honor. There's none like that. I'll say also that Hughes, in regard to this, it's actually a checklist is how he referenced it, this signing off thing. So my understanding is that inmates who are supposed to be transferred, on the morning of the transfer, it goes across his desk and he's supposed to sign off on a checklist. I don't know specifically what's in the checklist, but I think it's a ministerial sort of thing. Like, okay, he's got everything he's supposed to have and he's being sent with the right stuff and that's it. So it's not a medical evaluation in any sense. It's simply, does he have all the stuff that he needs that we're supposed to send him with? Is there any final question? Is there any evidence that the order that was issued by the state court directing that he not be transferred back to DOC custody, that they had any knowledge of that or that it was in a file that the prison had, that Forsyth County had or the sheriff's office had? I'll say for these two officers, I'm sorry. Counsel, your time has expired. I know, but he's answering my question. So, Your Honor, on the court order, it says it goes to counsel for the state and counsel for Mr. Johnson. It doesn't say that it went to the sheriff's office. That said, it wouldn't be surprising to me if it went to the sheriff's office, because they're supposed to know about it and not transfer him. So I can't say specifically where it went or who had it. So far as Fee and Hughes, the evidence is, no, they didn't know anything about it. Fee's response to the grievance is, I will need to see the court order to proceed any further. So if it was in the file, he would have been able to grab it and see it in the file, and it appears that he was not able to do that. Thank you. Thank you. I'm sorry. I was on mute. Mr. Bloomberg. Yes. Good morning, Your Honor. May it please the court, Alexander Bloomberg on behalf of Ricky J. Johnson. This case presents the court with the single issue of whether the district court properly denied qualified immunity to defendants. The court can quickly dispose of this appeal by affirming the district court on the ground that defendants' direct defiance of a lawful court order was outside their authority, and therefore the defense of qualified immunity is not available to them, or that defendants failed to meet their burden to show that they acted within the scope of their discretionary authority. Mr. Bloomberg, is that actually so easy when it's not clear that we have evidence that they knew about the order? Your Honor, I think that subjective awareness of the court order isn't relevant to that issue. It's ultimately a legal determination of the authority that they had, and whether they knew what their authority was or not doesn't change the legal contours of what their authority actually was. In this case, there was a lawful court order that specifically stated that Mr. Johnson shall not be returned to the Department of Corrections, and that's exactly what happened here. What about the fact that we don't have any evidence of the direct involvement of these people in the transfer? So, I don't think that the court needs to reach that issue if it agrees that the defendants acted outside the scope of their discretionary authority. But I guess my question is, in what way would they have acted outside the scope of their discretionary authority if we have no evidence that they acted at all? Sure, I understand that. Well, I think that the only issue before the court on appeal, given the limited jurisdiction here, is the appeal of qualified immunity. And the threshold inquiry of discretionary authority has to be decided before moving on to looking at the evidence of whether they were even involved in the transfer or not. Those factual issues, if they didn't have the authority, need to be left to the district court. But if the court moves on beyond that, I think that there was evidence that both defendants were involved in the transfer. What evidence is there specifically? See, I don't think it's hard to establish he was involved in the transfer. He signs off on the transfer. That's easy. My question to you is, what evidence in this record is there that the other officer, Fee, played any role at all in the transfer? The only thing I can see in the record is the statement that he submitted in which the declaration of Andrew Fee in which he said he played no role whatsoever in it. And there's no evidence, as best I can tell, that he even had any supervisory authority over Hughes insofar as Hughes actually did play a role in the transfer. So what is there to tell me that would be sufficient to establish that Fee played any role whatsoever in the transfer, which is, after all, the act that forms the core of the deliberate indifference here? Certainly, Your Honor. And admittedly, the record is not perfect, and we do agree that there is not... You see, the problem I have is not that the record is not perfect, but that the record is barren. It's empty. I have nothing that tells me that Fee played any role or even had the theoretical power to play any role in supervising Hughes. Have I misapprehended that? Well, Your Honor, Mr. Johnson's position is that the grievance itself creates a key question of fact there. The part of the grievance that says, we sent you there, which was signed off by both Lieutenant Fee and Sergeant Hughes, creates that question of fact and lines up with other documents in the record indicating that these defendants did send Mr. Johnson to Augusta State Medical Prison. The Augusta State Medical Prison documentation itself indicates that he was sent there from the county jail for evaluation. There's the checklist that you mentioned before that Sergeant Hughes signed off on. The thrust of my question is not whether he was sent there. Plainly was, and plainly Hughes was involved in the act of transferring by setting it off. I guess what I'm asking is specifically with respect to Lieutenant Fee, is there any evidence that he played any role other than what he wrote on the Forsyth County grievance form that you just cited where he said, we sent you there for the procedure you requested to be done? Is there any other evidence that implicates Fee in the actual decision of transfer? There's the grievance and there's the imprints that should be taken given Mr. Johnson's assertion of the small intimate nature of the facility. Everyone at that facility was aware of his situation due to that nature. At the time, it is a very small facility. It's got a maximum capacity of about 200 inmates and about 20 staff. What record evidence do we have about this facility size? I mean, I read it, I appreciate it, but I don't find any evidentiary support for those statements. Admittedly, there's nothing in the record beyond Mr. Johnson's assertion as to the size of the facility, but it's my understanding that the size of the facility is not a factual issue in dispute here. And that statement that you're referring to that Mr. Johnson made is the one that he made in his pro se brief, correct? Not something that was before the district court at the time it made its decision? That's correct, Your Honor. Let me ask you a question in a slightly different way, Mr. Bloomberg. Let's assume for the purposes of my question, one, that he had a serious medical condition. After all, he was diagnosed with an inguinal hernia and he was scheduled for laparoscopic surgery to correct the problem. So let's go beyond whether there's a serious injury. For me, that's not a hard question. And let's go beyond the question of, let's assume for the purposes of my question, that Hughes was involved in the act of transfer by actually signing off on the transfer that day. What evidence is there in the record that either Hughes or Fee knew that the plaintiff had suffered from an inguinal hernia and had been scheduled for surgery as an outpatient on the 12th of July? Is there any evidence to show that they knew that? The evidence there would be the grievance history of Mr. Johnson. It would be the nature of the facility. And for Sergeant Hughes in particular, it would be his sworn affidavit that indicates that he reviewed records, filled out a checklist, and signed off on Mr. Johnson's transfer. Let's talk about the last item. What you're talking about there appears on page 2 of the declaration of Hughes under item 5. He says, my role was simply to review Johnson's folder and sign the supervisor checklist prior to his release to the Department of Corrections custody. Is there anything in this record that tells me that Johnson's folder included any reference to him having been scheduled for laparoscopic surgery on the 12th? Unfortunately, not, Your Honor. And part of that is because the folder was not produced to Mr. Johnson in the course of discovery, despite a request that Mr. Johnson believes was on point to those in other records, which has been an issue throughout this litigation, frankly. You see, the problem that I'm having is that I'm stuck with the record that was presented here and that's made part of the total record for this court. And in order to establish deliberate indifference to a serious medical need, the plaintiff must establish the subjective knowledge of a risk of serious injury, must establish the disregard of the risk, and must establish that that all occurred by conduct that amounts to more than mere negligence. And the problem that I have right off at the outset is I don't see any knowledge that's established here. I don't see any evidence that remotely suggests that either Hughes or See knew that he was scheduled for a hernia operation on the 12th that would have put them on notice that he had a serious medical need. And in the absence of that, I don't see how you get to first base in establishing triable issues about any of this. Maybe I'm missing it, but where in the absence of any knowledge that either Hughes or See knew that he had an inguinal hernia and he had been diagnosed and scheduled for laparoscopic surgery, how can you establish deliberate indifference to a serious harm? Certainly, Your Honor. And I would just briefly reiterate that even before getting to that question, the discretionary authority issue bars consideration of that. But in any event, to respond to your question... What you're saying is if they acted in a manner that was not within their discretionary authority, the case is over, even if Judge Story was wrong on the second issue, you'd have to refer. I understand that. But I'm assuming for the purposes of my question, specifically, that to the extent they acted at all, they acted within the scope of their discretionary authority. And I'm asking you, how do you establish that either of them had subjective knowledge of the risk of serious harm? Understood, Your Honor. And again, I would point to the grievance and the checklist, which both need to be taken in the light most favorable to Mr. Johnson. I agree with all of that. I agree that it has to be taken in the light most favorable to him. I have the grievance in front of me, particularly the grievance of 72413, and I have the handwritten notes by Lieutenant Fee and that it was signed by Sergeant L.K. Hughes as well. But what is it in that specific grievance that yields the notion that they knew he was suffering from a hernia and had been diagnosed for and scheduled for laparoscopic surgery? Well, the sentence, we sent you there, I think is an implicit admission that they knowingly sent him for a procedure, which would in turn draw the inference that they knew the hernia was an ongoing issue. Again, I would just point to the... That's the problem. It's very hard for me to see how a jury could reasonably draw that inference of knowledge from the grievance. Is there anything other than the grievance itself from which a jury could infer knowledge on the part of Hughes or Fee? Well, briefly, Your Honor, I would just quickly disagree with the premise of your question that there was a production order here, but to respond to your question... No, no, no, no. That's not my question. My question is a very simple one, Mr. Bloomberg. Yes. You said that the grievance is enough to yield an inference that they had knowledge that he was scheduled for inguinal hernia surgery. I'm asking you, independent of that grievance, is there any other evidence in the record that you can point me to that would allow a jury to infer knowledge beyond this grievance? Sure. And I think that the grievance, the checklist, and the nature of the facility all have to be taken together and considered collectively with all inferences taken in favor of Mr. Johnson to get across that line. Help me understand, counsel... Counsel, your time has expired. If you can help me understand, what's the checklist? I'm just not sure that I know what you're referring to in that regard. What is that piece of evidence? It's unfortunately not in the record, Your Honor, but Sergeant Hughes did say that he reviewed a folder of Mr. Johnson's records with a checklist that he signed off on, and it's Mr. Johnson's position that the inference that must be taken from that was that there were records in there indicating his medical appointment at the Northside facility. Okay, so it's the grievance, the checklist. Is there anything beyond those two items? The nature of the facility. I'm sorry, I couldn't hear you. My apologies. The nature of the facility, Your Honor. Okay, that it was a small facility. Yes. Gotcha. Thank you very much. Thank you. Thank you, Mr. Blumberg. Mr. Waymire. Yes, Your Honor, thank you. I want to address a few things that were discussed there, and so let me talk about the grievance first. One thing that I think I need to point out that hasn't been mentioned is that it's kind of a dating issue. Lieutenant Fee and Sergeant Hughes, if you look at the grievance, signed off on July 25th of 2013, and the only thing that was written by Fee was the first line of the response, which is, I will need said court order to proceed any further. The rest was written by Captain C.G. Smith, and the date on that is three days later. So everything that Smith wrote is Smith's writing. It's not Fee's writing, and Fee and Hughes are not signing off on anything except what Fee wrote, which is the first line. I'm sorry. Maybe I'm confused. The writing, this decision was made, blah, blah, blah, that entry was made by Smith, not by Fee? That's correct. How do we know that? How do we know that? Well, there are two ways you know that. One is that after that kind of large paragraph, it's signed off on the bottom right of that large paragraph by Captain C.G. Smith, and it's dated 7-28, and there's a signature there. So you see his separate signature. If you were to look at the declaration of Andrew Fee, you would see a different copy of that grievance, and it's the copy as of 7-25-13. This is in the record at document 80-3 at 4. It's with the Fee Declaration, and that doesn't have anything by Smith. All it has is Fee and Hughes' signature, and it says, I will need to see said court order to proceed any further, and the rest is blank. So that's everything that Fee and Hughes said and did in response to that grievance. Let me ask you this question. Is there anything in this record, whether by way of an affidavit or a declaration from Captain Smith or a deposition or anything? I believe Captain Smith was sued as well, and I think there is a declaration from him. I don't know that it has a significant bearing on the issues that are on appeal right now. If you want me to submit, you know, after. Well, I assume it would be in the summary judgment record that went to the district court. That's correct, Your Honor. Okay. That's correct. I didn't mean to cut you off. I just wanted to know about that. What about this issue of the checklist? Is there any evidence in the record, the summary judgment record before the district court, that explained what the checklist was that Hughes was referring to? It's only in Hughes' declaration, and it's only a reference to the checklist. Blame me. I'm the lawyer. If I thought that the checklist mattered, I sure would have filed it. I didn't think that any argument would be made about it. I don't file every piece of paper that might be in the record. All I really is doing is looking for help from you and your colleagues as to what I can find in the record. So there is no checklist in the record, and I would submit that the best evidence rule says if you're going to rely upon some document, you've got to have that document. So I don't think that any inference can be drawn from whatever the checklist might have been. I will say, also in answer to your previous question, the declaration of Charles Smith is in the record document 80-5, and it doesn't say anything about this grievance. He was only sued in relation to a different claim, so that's the only thing that his declaration addresses. So that's that. Let me talk about briefly this court order. The court order does not confine anybody's discretionary authority is what I submit. I'm certainly not in favor of disregarding or violating court orders, but that's really not what's going on here. That's really not what's going on here. The court order says you're not to house him at the Department of Corrections. He's not to be sent back to the Department of Corrections. And it really doesn't say anything about sending him for a medical appointment that happens to be at the Georgia Department of Corrections. So it's not a violation of the court order to honor this request to send him to a medical appointment at the Department of Corrections. I think as it turned out, he was kept at the Department of Corrections for a bit longer than was intended, but that was all in the Department of Corrections control. But the point of the court order is I want him here available for court when we have court. Counsel, does the record reflect what was filed with the court here by Mr. Johnson seeking such an order? Somebody filed an order. You sought that order from the court. Was that order entered to a sponte or can I tell? I don't think in this particular record there is anything about what triggered that court order and the litigation that triggered that court order. Mr. Johnson had that material and if he filed something along those lines, I don't remember it. The last thing I'll mention about the court order is that I just don't think it has anything to do with the qualified immunity, discretionary authority element. Again, there's no information that they even knew about this court order and that court order is not going to confine the scope of what they can do. Okay, thank you, Your Honors. Thank you, Mr. Waymeyer. We appreciate your argument and that of Mr. Bloomberg. That is the end of our cases for today. We've got a short day today and we look forward to it. Thank you for your argument and we look forward to holding court for the last day of the week tomorrow. Thank you.